Filed 10/13/23  Theno v. Fernandez CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| KIP THENO, | B314277 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCV08597) |
| v. | |
| FRANK FERNANDEZ et al., | |
| Defendants and Respondents. | |

APPEAL from orders of the Superior Court of Los Angeles County, Lia R. Martin, Judge.  Affirmed.

Klapach & Klapach and Joseph S. Klapach for Plaintiff and Appellant.

Hunton Andrews Kurth, Michele J. Beilke, Julia Y. Trankiem, Veronica A. Torrejón and JeeHyun Yoon for Defendants and Respondents.

————————————

Plaintiff Kip Theno appeals from orders granting motions to quash service of summons in favor of his former supervisors, defendants Frank Fernandez and Keith Boettiger.  Theno's complaint alleged causes of action against Fernandez and Boettiger for defamation and intentional infliction of emotional distress.  On appeal, Theno contends California may exercise specific jurisdiction over Fernandez and Boettiger because they purposefully directed tortious activity at California by:  (1) making defamatory statements to Theno's coworkers and colleagues in California, and (2) retaliating against him after he complained about violations of medical privacy laws and the use of a competitor's trade secrets.  We conclude Theno failed to meet his burden to show his claims are related to Fernandez and Boettiger's contacts with California.  Specifically, there was no evidence that Fernandez or Boettiger made defamatory comments or engaged in extreme and outrageous conduct directed at California.  Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Employment History

In 2018, Boettiger was the president of the neuromodulation division of St. Jude Medical S.C., Inc, a wholly-owned subsidiary of Abbott Laboratories (collectively referred to as Abbott).  Boettiger lived in Texas.

One subdivision of neuromodulation is chronic pain therapies.  Ryan Walters was the vice president of chronic pain therapies.  Chronic pain therapies are divided into five

geographic areas, with each area managed by an area vice president.  Walters supervised the five area vice presidents.

In 2018, Boettiger and Walters contacted Theno, who is a California resident, to recruit him for the position of Area Vice President – West.  Walters offered Theno the position, although Theno believes Boettiger made the decision to hire him.

Theno received and executed employment documents in California.  Abbott provided Theno with a computer for use in his home office in California.  Although Theno traveled out of state for work, his primary workplace was his home office in California.

Theno managed four regions in California and three regions in other western states.  Abbott employed regional sales managers, territory managers, and clinical specialists in each region.  During his employment with Abbott, Theno had between 30 and 45 California residents working for him and his sales team.

Shortly after Theno began working for Abbott, Fernandez replaced Walters as the vice president of chronic pain therapies and became Theno's direct supervisor.  Fernandez lives in Florida.

Fernandez communicated with Theno nearly every day.  He was aware of Theno's business travel schedule.  Fernandez sent messages to Theno about who to hire, who was performing poorly, and who to fire.

Fernandez and Boettiger held weekly telephone calls with the five area vice presidents.  Theno was in California during the calls, and the participants discussed general business matters.

In February 2019, Theno received a message from Abbott employee Spencer Elder about a "trial initiative plan" to increase

the number of implants on patients who had tested for a neuromodulation device, but not had the device implanted. Theno believes Boettiger and others created the initiative to increase sales. Fernandez, Boettiger, and Elder directed Theno to participate in the initiative.

On February 15, 2019, Theno told Fernandez and Elder that he thought the initiative violated medical privacy laws. He asked for written confirmation that Abbott's compliance or legal departments approved the plan, but Theno was simply told "it's ok." Fernandez refused to answer Theno's questions and told Theno to "just fucking do it." Theno refused to participate until he was assured the initiative had been reviewed by the legal department. Fernandez and Elder referred to the initiative as a "PTA gap process analysis." Theno believed the name of the initiative simply disguised its true nature, but he ultimately complied because he was afraid that he would lose his job. Theno believes his complaints about the initiative would have been reported to Boettiger immediately.

Fernandez once visited Theno in California, riding with him to visit doctors and other customers in California. They did not discuss anything related to the initiative. Fernandez once met with a doctor in Theno's territory in California without including Theno, which made Theno feel undermined and excluded. Fernandez had contact with most of the physicians in California working with Abbott, knew of the territory manager's business plans for California, and considered California to be an essential part of his territory.

Theno was a top performer at Abbott. His sales number and other metrics were consistently higher than other area vice presidents. In June 2019, however, Fernandez gave Theno a

performance improvement plan (PIP) while they were together in Austin, Texas, which Theno believes was approved by Boettiger.

In September 2019, Boettiger and Fernandez sent the area vice presidents a list of a competitor's salespeople, including their sales numbers. Theno was instructed to try to recruit the salespeople. Theno refused, because he believed it would be an illegal use of a competitor's trade secret information and a violation of Abbott's policies. Theno complained to Abbott's human resources and employee relations departments about the release of the competitor's information.

Shortly afterward, Boettiger assigned his executive assistant Jessica Cline to work for Theno in California. Cline asked Theno about his PIP and his complaints, and she communicated with Boettiger.

When Theno was at home in California on October 11, 2020, Fernandez called and terminated Theno's employment over the telephone.

## Litigation Initiated

On February 28, 2020, Theno filed an action against Abbott and St. Jude Medical, Inc. (collectively the employer defendants), as well as individual defendants Fernandez, Boettiger, and Cline. The complaint alleged causes of action against the employer defendants for retaliation, wrongful termination in violation of public policy, unfair business practices, and waiting time penalties. The complaint alleged causes of action against all of

the defendants for intentional infliction of emotional distress and defamation.

In May 2020, the employer defendants removed the case to federal court. They argued that Cline should be disregarded for diversity purposes, because Theno could not state a claim for intentional infliction of emotional distress or defamation against Cline. They argued, among other reasons, the managerial privilege precluded Theno from suing an individual defendant for making personnel decisions within the scope of her employment, and the actions alleged did not rise to the level of extreme and outrageous conduct. Theno filed a motion to remand the matter to state court, which the federal court granted. The federal court concluded that a fact intensive inquiry into Cline's conduct was inappropriate at that stage of the pleadings because Theno could amend the complaint to allege new or different facts demonstrating that Cline's conduct went beyond the scope of her normal employment activities or that she behaved in a manner exceeding the bounds of conduct tolerated in society.

## Allegations of Operative Complaint

Theno filed the operative, unverified amended complaint in this case for the same causes of action against the same defendants based on the following factual allegations. After Theno raised his concerns about medical privacy violations, Fernandez started a campaign of retaliation against him as follows: Fernandez spoke poorly about Theno to the other area vice presidents and to Theno's sales team in California. He was negative and disrespectful to Theno, ignored him, and was hostile toward him during meetings and in front of coworkers.

6

Fernandez, Cline, and Boettiger told Theno's sales team (half of whom were located in California), territory managers (many of whom lived in California), and the other area vice presidents that Theno was not competent and not trustworthy, or words to that effect, and that Theno was performing poorly, which was objectively false.

During telephone meetings, Fernandez praised the other area vice presidents and skipped Theno, even though Theno's sales numbers were higher. Several of Theno's California sales team members were on the calls.

After Fernandez placed Theno on the PIP in June 2019, Fernandez spoke regularly with Theno's regional sales managers, three of whom lived in California, with and without Theno. Theno was informed and believed that during these conversations Fernandez told the employees that Theno was not competent in his role, was performing poorly and was not trustworthy. Each of these statements were false, as Theno was performing well, and in most cases, much better than his counterparts.

Theno was shocked when Cline was reassigned to serve as Theno's executive assistant. Cline repeatedly asked Theno about the PIP and why he was in contact with employee relations. Several coworkers told Theno not to trust Cline, because she would report Theno's actions back to Boettiger. Cline was assigned to Theno to help Boettiger and Fernandez intimidate Theno and eventually terminate his employment. Cline made Theno extremely anxious, making it nearly impossible to do his job. Theno and Cline, who both resided in California, communicated every day. At one point, Cline told Theno that his job had been filled. The next day, she said that she had spoken with Boettiger and learned his job had not already been filled.

Her response showed she was reporting her conversations with Theno to Boettiger.

Around October 4, 2019, Fernandez refused to speak with Theno. On October 11, 2019, a week after complaining to human resources about the use of information about a competitor's personnel, Theno was terminated.

With respect to the cause of action for intentional infliction of emotional distress, the complaint alleged the defendants' conduct was outrageous and discriminatory. The defendants acted with an intent to cause, or reckless disregard for the probability of causing, Theno to suffer severe emotional distress. As a result of the infliction of emotional distress, Theno has sustained loss of earnings and other employment benefits, and has suffered severe emotional distress. The defendants acted outside the normal scope of business for the purpose of causing Theno to suffer financial loss and severe emotional distress, and are guilty of oppression and malice justifying punitive damages.

The cause of action for defamation additionally alleged that beginning in the summer of 2019, the defendants made the following statements about Theno without believing them to be true: (1) that Theno was performing poorly for the employer defendants, (2) that Theno was insubordinate and incompetent at work, and (3) that Theno, in his professional capacity, could not be trusted. The statements were made by management-level employees of the employer defendants, including Fernandez, Cline, and Boettiger. The defendants made these statements to Theno's sales team, coworkers, and other employees of the employer defendants without any business reason to do so. The statements were heard by people in California and the United States, including Theno's coworkers and other members of the

profession.  The publication of the statements were motivated by hatred or ill will toward Theno for reporting the defendants' potential violations of California law.  In addition, the defendants caused the statements to be published to punish Theno for his complaints and were motivated by discriminatory animus.  The statements were false.

## Motions to Quash Service

Fernandez specially appeared and filed a motion to quash service of summons for lack of personal jurisdiction.  He filed his declaration in support of the motion stating as follows.  He is employed as the Division Vice President of Chronic Pain Therapies overseeing five geographical areas – West, Midwest, Central, East, and South – each managed by an area vice president.  Fernandez had responsibility to manage Theno and the other area vice presidents across the United States.  Theno, as Area Vice President – West, had responsibility for the western United States, including California and approximately a dozen other states.  Fernandez met with Theno on different occasions in Texas, Arizona, Maryland, Utah, and Florida.  Fernandez communicated with Theno through email and telephone calls.  Fernandez did not always know where Theno was when they spoke.

Fernandez declared that he did not attempt to discredit Theno with his sales team or state that Theno was incompetent, untrustworthy, or insubordinate.  He did not knowingly pressure or intimidate Theno to do anything that violated any laws or regulations.

Fernandez has never resided in California or had a business office in California. He has never been employed by an employer in California. He does not own real or personal property in California, a business interest in California, or any assets in California. He has never paid taxes in California or sued anyone in California. On average, Fernandez travels to California once a year, solely for business. He was last in California in July 2019 to meet with a physician, not with Theno.

Boettiger also specially appeared and filed a motion to quash service of summons for lack of personal jurisdiction. Boettiger filed his declaration in support of his motion stating the following facts. He is responsible for Abbott's entire global business and implements plans on a business-wide level, not targeted solely toward California or any other state. The only time that Boettiger met Theno in person was at a dinner in Colorado shortly after Theno began working with the company and at national sales meetings in Austin, Texas. Most of Boettiger's communications, plans, and directives were implemented through Fernandez. When Boettiger communicated with Theno by email or telephone, he did not know Theno's location, as Theno frequently traveled for work.

During Theno's employment, Boettiger did not try to discredit him with his sales team. He did not say Theno was incompetent, untrustworthy, or insubordinate. He did not direct Cline to spy on Theno or collect information about him.

Boettiger has never resided in California or had a business office in California. He has never been employed by an employer in California. He does not own real or personal property in California, a business interest in California, or any assets in California. He has never paid taxes in California or sued anyone

10

in California. On average, Boettiger travels to California four times per year, solely for business. He was last in California in March 2020.

Boettiger also filed excerpts from Theno's deposition. Theno had no knowledge that Boettiger was involved with his performance improvement plan, but he believes Boettiger knew of the performance plan. Theno had no discussions with Boettiger about the medical privacy issue with respect to the initiative or the use of a competitor's information.

**Opposition to Motions to Quash and Further Proceedings**

Theno filed an opposition to Fernandez's motion to quash. He submitted his declaration in support of the opposition containing evidence described further in the discussion below. He submitted text messages and email exchanges, as well as the performance improvement plan and his written response to Fernandez. He also submitted copies of his complaints to employee relations and human resources.

Theno filed an opposition to Boettiger's motion to quash service of summons as well. He filed a declaration in support of his opposition as described further in the discussion below. Fernandez and Boettiger each filed replies.

The trial court entered an order on June 22, 2021, granting Fernandez's motion to quash service of summons. On June 23, 2021, the trial court entered an order granting Boettiger's motion to quash service as well. Theno filed a timely notice of appeal from the June 22, 2021 order and the June 23, 2021 order.

11

# DISCUSSION

Theno contends Fernandez and Boettiger are subject to specific jurisdiction in California because they purposefully directed tortious conduct and communications at California. We conclude that Theno failed to meet his burden of proof to demonstrate by a preponderance of the evidence that all the jurisdictional criteria were met.

## General Principles of Personal Jurisdiction

California courts "may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." (Code Civ. Proc., § 410.10.) The federal Constitution permits a state to exercise personal jurisdiction over an out-of-state defendant "if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate " ' "traditional notions of fair play and substantial justice." ' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444.)

Personal jurisdiction may be general or specific. (*Thomson v. Anderson* (2003) 113 Cal.App.4th 258, 265–266 (*Thomson*).) The parties agree that the sole issue in this case is whether Fernandez and Boettiger are subject to specific jurisdiction. A defendant may be subject to specific jurisdiction when (1) the defendant has purposefully availed himself or herself of forum benefits; (2) the controversy at issue arises from or is related to the defendant's forum-related contact; and (3) assertion of jurisdiction comports with fair play and substantial justice.

(*Ibid.* at p. 265; *Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269 (*Pavlovich*).)

**Case Law Illustrating Purposeful Availment**

The focus of the first step of the jurisdiction inquiry depends on the nature of the claim. (*Casey v. Hill* (2022) 78 Cal.App.5th 1143, 1170 (*Casey*).) In contract claims, courts consider whether the defendant purposefully and voluntarily directed activities toward the forum such that the defendant should expect to be subject to the court's jurisdiction based on the benefits received from contacts with the forum. (*Ibid.*) In tort claims, courts use a "purposeful direction" test and consider evidence that the defendant directed actions at the forum, even if the defendant's actions were taken outside of the forum. (*Ibid.*) The purposeful direction test requires evidence of intentional conduct that deliberately targets the forum state along with the defendant's knowledge that the conduct would cause harm in the forum. (*Ibid.*)

It is the defendant's intentional and allegedly tortious conduct directed at the forum that creates the necessary contacts to assert personal jurisdiction. (*Casey*, *supra*, 78 Cal.App.5th at p. 1171; (*Rivelli v. Hemm* (2021) 67 Cal.App.5th 380, 395–396 (*Rivelli*).) "Applying these principles, numerous courts have found the purposeful direction requirement met where the nonresident defendant purposefully sent tortious communications into a forum and thereby injured its residents." (*Casey*, at p. 1171.)

The United States Supreme Court introduced the "effects" test in *Calder v. Jones* (1984) 465 U.S. 783 (*Calder*). In *Calder*, an actress who lived and worked in California filed a libel action

13

in California against a reporter and an editor working in Florida based on an article about her in a nationally-syndicated newspaper. (*Id.* at pp. 784–786.) The defendants moved to quash service on the ground that California lacked personal jurisdiction over them as Florida residents. (*Id.* at pp. 785–786, 789.) The *Calder* court disagreed, concluding the defendants had relied on California sources, wrote an article about the California activities of a California resident, knew the article would have a potentially devastating impact on the plaintiff, and knew the harm from emotional distress and reputational injury would be suffered in California, where the newspaper had its largest circulation. (*Id.* at pp. 788–790.) "In sum, California [was] the focal point both of the story and of the harm suffered. Jurisdiction over [the defendants was] proper in California based on the 'effects' of their Florida conduct in California." (*Id.* at p. 789.) "An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California." (*Id.* at p. 790.)

The defendants in *Calder* argued that they had no control over their employer's marketing and no direct economic stake in the employer's California sales. (*Calder*, *supra*, at p. 789.) The court acknowledged that the defendants' contacts with California were not to be assessed based on their employer's activities in California. (*Id.* at p. 790.) "On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually. [Citation.] . . . In this case, [defendants] are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that basis." (*Id.* at p. 790.)

14

In *Walden v. Fiore* (2014) 571 U.S. 277 (*Walden*), the United States Supreme Court explained that the jurisdiction analysis focuses on the relationship of the defendant, the forum, and the litigation. (*Id.* at pp. 283–284.) The defendant's conduct must create contacts with the forum that are the basis for jurisdiction. (*Id.* at pp. 285–286.) Jurisdiction is not created simply based on contacts between the forum and the plaintiff or a third party. (*Id.* at p. 284) Similarly, jurisdiction must be based on the defendant's contacts with the forum state, not merely on the defendant's contacts with people who happen to reside in the state. (*Id.* at pp. 285–286.) "To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." (*Id.* at p. 286.)

The *Walden* court provided additional explanation of the *Calder* opinion: "[T]he reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort. However scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to (and read and understood by) third persons. [Citations.] Accordingly, the reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens. . . . In this way, the 'effects' caused by the defendants' article—*i.e.*, the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to *California*, not just to a plaintiff who lived there. That

15

connection, combined with the various facts that gave the article a California focus, sufficed to authorize the California court's exercise of jurisdiction [in *Calder*]." (*Walden*, *supra*, 571 U.S. at pp. 287–288, citations & fn. omitted.)

Where there is no evidence that a defendant directed allegedly tortious activity at California, even if the plaintiff experienced injury in California, courts have found no basis to exercise jurisdiction. For example, in *Pavlovich*, *supra*, the California Supreme Court applied the effects test to conclude that a nonresident defendant who merely posted a California plaintiff's proprietary information on a website accessible to the general public did not expressly aim his tortious conduct at or intentionally target California. (*Id.* at pp. 273–279.)

Similarly, in *Burdick v. Superior Court* (2015) 233 Cal.App.4th 8 (*Burdick*), a skin care company employee living in Illinois made a public social media post suggesting a group of bloggers had criminal histories. (*Id.* at pp. 14–15.) The bloggers filed an action in California against the employee. (*Id.* at p. 16.) The *Burdick* court concluded that merely posting an allegedly defamatory statement on social media while knowing the plaintiffs were in California, which was the suit-related conduct in that case, did not create a "substantial connection" between the defendant and California. (*Id.* at pp. 25–26.) There was no evidence that the social media page had a California audience through the defendant's social media connections or advertisements on the page. (*Ibid.*) Simply posting on a public social media page, knowing the plaintiff was in California, was insufficient to confer jurisdiction over the defendant.

In *Zehia v. Superior Court* (2020) 45 Cal.App.5th 543, 554 (*Zehia*), the court found it proper to exercise jurisdiction based on

more limited effects in California.  In *Zehia*, a defendant located in Michigan sent direct messages to a plaintiff in California, fabricated messages with allegedly defamatory statements about the plaintiff and impersonating the plaintiff, and sent the fabricated conversations to a third party in California.  (*Id.* at p. 556.)  The *Zehia* court concluded the defendant's messages were targeted exclusively at a California audience (the plaintiff and the third party), so the defendant's contacts with California were not random, fortuitous, or attenuated, and did not result from unilateral activities of the plaintiff.  (*Zehia, supra,* 45 Cal.App.5th at p. 557.)  In addition, the alleged reputational injury occurred when the defamatory statements were received by the California residents, which connected the defendant's conduct to California.  (*Ibid.*)  And the content of the allegedly defamatory conversations had a California focus.  (*Ibid.*)

Based on these factors, the *Zehia* court concluded the defendant's suit-related conduct established a substantial connection with California.  (*Zehia, supra,* 45 Cal.App.5th at p. 558.)  By sending messages and conversations directly to California residents for the alleged purpose of interfering with their relationship and causing reputational injury in California, the court found Zehia purposefully reached beyond his state and into California, such that he should reasonably anticipate being required to respond in a California court.  (*Ibid.*)

Other courts have found jurisdiction proper where the plaintiff suffered injury in California and the defendant's alleged tortious conduct directed at California implicated an important interest of the forum as expressed by state statute.  In *Schlussel v. Schlussel* (1983) 141 Cal.App.3d 194 (*Schlussel*), for example, the plaintiffs filed an action in California for intentional infliction

17

of emotional distress based on obscene and threatening telephone calls allegedly made to them by the defendant, who was a resident of Florida. (*Id.* at p.196.) The *Schlussel* court noted that California had a stated interest in protecting residents from annoying and obscene telephone calls, as provided in the California Penal Code. (*Id.* at pp. 197–198.) The court concluded the criminal nature of the telephone calls were effects that made it an exceptional case and the motion to quash should have been denied. (*Id.* at pp. 198–199.)

More recently, in *Hogue v. Hogue* (2017) 16 Cal.App.5th 833 (*Hogue*), a wife living in California sought a restraining order against her estranged husband living in Georgia. The husband did not deny sending a video message to her on social media pretending to shoot himself in the mouth. (*Id.* at p. 838) The *Hogue* court concluded that the Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.) reflected California's concern with an exceptional type of conduct that it subjects to special regulation. (*Id.* at p. 839.) The court further stated, "The act of purposefully *sending* a video of a mock suicide to plaintiff in California (particularly in the context of alleged domestic violence taking place in Georgia) is indisputably conduct that would disturb plaintiff's peace of mind within the meaning of the act and be the basis for granting a restraining order. [Citations.] As a result, this was sufficient to vest personal jurisdiction in the courts of this state over defendant to enjoin any further such conduct." (*Ibid.*)

## Burden of Proof and Standard of Review

"When a nonresident defendant challenges a trial court's exercise of personal jurisdiction, the plaintiff bears the initial burden to demonstrate facts justifying the exercise of jurisdiction. [Citations.] To meet this burden, a plaintiff must do more than make allegations. A plaintiff must support its allegations with 'competent evidence of jurisdictional facts. Allegations in an unverified complaint are insufficient to satisfy this burden of proof.'" (*Rivelli, supra,* 67 Cal.App.5th at p. 393.)

"The plaintiff has the right to conduct discovery with regard to the issue of jurisdiction to develop the facts necessary to sustain this burden." (*Mihlon v. Superior Court* (1985) 169 Cal.App.3d 703, 710.) A declaration that lacks foundation or consists of inadmissible hearsay is not sufficient to meet the plaintiff's evidentiary burden. (*Floveyor Internat., Ltd. v. Superior Court* (1997) 59 Cal.App.4th 789, 796.) "Declarations cannot be mere vague assertions of ultimate facts, but must offer specific evidentiary facts permitting a court to form an independent conclusion on the issue of jurisdiction." (*In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 110.)

"If the plaintiff makes this showing by a preponderance of the evidence on the first two requirements (i.e., that the defendant has purposefully availed itself of the forum and the plaintiff's claims relate to or arise out of the defendant's forum-related contacts), the burden shifts to the defendant to demonstrate that the exercise of jurisdiction would be unreasonable." (*Rivelli, supra,* 67 Cal.App.5th at p. 393.)

"On appeal, we independently review the trial court's legal conclusions as to whether a defendant's contacts with California justify requiring that defendant to mount a defense in the forum. [Citation.]  If the facts giving rise to jurisdiction are conflicting, we will not disturb the trial court's express or implied factual determinations where supported by substantial evidence. [Citation.]  'When no conflict in the evidence exists, however, the question of jurisdiction is purely one of law and the reviewing court engages in an independent review of the record.' " (*Rivelli*, *supra*, 67 Cal.App.5th at p. 393.)

A motion to quash does not test whether the complaint states a cause of action, as a demurrer would, and it does not entail a determination of the merits of the complaint.  (*Kroopf v. Guffey* (1986) 183 Cal.App.3d 1351, 1360.)  The issue is not whether the plaintiff will succeed on the ultimate issues of liability.  "[N]evertheless, when the plaintiff seeks to predicate jurisdiction on causing tortious effects in the forum state and when the record tends unequivocally to establish that the defendant's conduct did not cause such effects, the plaintiff 'cannot demand that we judge the question of jurisdiction in the light of a claim he apparently does not have.' " (*J. M. Sahlein Music Co. v. Nippon Gakki Co., Ltd.* (1987) 197 Cal.App.3d 539, 545.)

**Specific Jurisdiction as to Boettiger**

Theno contends Boettiger is subject to specific jurisdiction in California because he purposefully directed defamatory and retaliatory conduct at California, knowing Theno would experience the effects in California.  We conclude that Theno did

not meet his burden to establish the jurisdictional facts by a preponderance of the evidence.

## A. Evidence of Boettiger's Conduct

In Theno's briefs on appeal, he contends the following evidence submitted in opposition to Boettiger's motion to quash established the necessary jurisdictional facts as to Boettiger. Theno stated in his declaration that Boettiger participated in weekly calls with the five area vice presidents, including Theno, who was in California during the calls, to discuss general business matters. Boettiger had a significant interest in California because it was one of the highest performing regions. After Theno questioned the legality of the trial initiative plan and refused to implement it without assurances from Abbott's legal department, Boettiger became overly aggressive with Theno on the weekly telephone calls with the area vice presidents.

After Theno complained about the use of a competitor's information to recruit employees, Boettiger assigned Cline to work as Theno's executive assistant in California. Cline was in constant communication with Boettiger. Cline asked Theno about his performance improvement plan and his complaints.

Theno speculated that Boettiger instructed Cline to ask questions of Theno and that Cline relayed Theno's answers to Boettiger. He assumed Boettiger assigned Cline to Theno to harass him, gather information, and/or force him to quit. Cline's surveillance caused Theno to be constantly nervous and suffer from daily depression and anxiety. Theno believed Cline told members of Theno's team that he was incompetent and untrustworthy.

21

Theno also believed Boettiger directed Fernandez's actions toward Theno. He believed that Boettiger would have approved the performance improvement plan and the termination decision before Fernandez implemented those actions.

## B. Purposeful Availment and Relatedness

Each defendant's contacts with California must be assessed individually. Theno's evidence that Boettiger engaged in tortious conduct directed at California was that Boettiger had weekly telephone calls with a group of area vice presidents that included an employee in California (Theno), and after Theno complained about the trial initiative, Boettiger spoke overly aggressively to Theno during these calls. After Theno complained about the use of a competitor's information, Boettiger arranged for his former executive assistant to work for Theno in California. Theno remained in close communication with the assistant in California. Theno speculated in his declaration that Boettiger instructed Cline and Fernandez to take actions that Theno found to be harassing. He believes Boettiger must have approved the PIP and Theno's termination.

There is no evidence Boettiger made any allegedly defamatory statement. In Theno's complaint, he alleged Boettiger said he was insubordinate, incompetent, or untrustworthy, but he did not submit any evidence that Boettiger made any of these statements. In support of his argument on appeal, Theno simply cites the allegations of his unverified complaint, which are not evidence, and refers to the portion of his declaration in opposition to Fernandez's motion stating that Fernandez unjustly criticized Theno's performance during

telephone calls with the area vice presidents.  There is no evidence that Boettiger made any statement, let alone an allegedly defamatory statement to a California audience with effects in California.

With respect to intentional infliction of emotional distress through retaliatory conduct, Theno provided evidence that after he complained about perceived policy violations, Boettiger was overly aggressive toward him on weekly phone calls with area vice presidents, placed his former executive assistant to work for Theno and remained in communication with her, and likely approved the performance improvement plan and termination of Theno's employment.  We conclude there is no evidence of extreme and outrageous conduct directed at California with the knowledge that it would cause harm, and Theno's claim for intentional infliction of emotional distress is not related to the conduct in evidence.

In *Rivelli*, the plaintiffs provided evidence that a Swiss company defendant purposefully availed itself of forum benefits through ongoing contractual relationships with a California company, and an individual Swiss defendant purposefully availed himself of the privilege of conducting activities in California through his directorship at the California company and by negotiating a transaction between the two companies.  (*Rivelli*, *supra*, 67 Cal.App.5th at pp. 397, 405.)  The *Rivelli* court found the plaintiffs' evidence did not establish the necessary connection, however, between the defendants' activities in California and the plaintiffs' claims for fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and statutory violations of the Corporations Code.  (*Id.* at p. 399.)

23

The *Rivelli* court found it significant that the plaintiffs provided no evidence of fraudulent or tortious conduct, or any actual wrongdoing, that was directed at the forum by the individual defendant. (*Id.* at pp. 402, 406.) As a result, there was no evidence of fraudulent or tortious conduct that was directed at California by the Swiss company defendant, whose contacts with the forum were through the individual defendant. (*Id.* at p. 402.) "Therefore, appellants have not presented 'competent evidence of jurisdictional facts' [citation] tying [the Swiss company's] actions to the fraud claim." (*Ibid.*) The evidence showed the contacts between the Swiss company and California were contractual, while the tort claims in the complaint did not arise from or relate to the contractual relationship and were not supported by the jurisdictional evidence. (*Id.* at p. 404.)

After examining the evidence submitted in connection with the motion to quash, the *Rivelli* court noted that the individual defendant had disclosed his role to the board of the California company, did not vote on the transaction at issue in the case or participate in the discussion of alternative agreements, and there was no evidence the shareholders of the California company had been misled about the individual defendant's role in the transaction. (*Id.* at p. 406.) The court concluded, "Having carefully reviewed the record presented of [the individual defendant's] contacts with California through his service on the [California company's] board, and the nature of [the Swiss company defendant's transaction with the California company], we conclude that in each instance appellants have not demonstrated the required relatedness between the California forum, [the individual or the company defendant], and the

specific claims at issue, as would be required to permit the constitutional exercise of case-linked jurisdiction." (*Id.* at p. 408.)

In *In re Automobile Antitrust Cases I & II*, *supra*, 135 Cal.App.4th at p. 111, the plaintiffs alleged several foreign car manufacturers were subject to jurisdiction in California because each participated in a conspiracy that harmed California consumers. The plaintiffs' counsel conceded that he had no evidence of conspiracy as to three of the foreign manufacturers, but relied on inferences from evidence implicating other parent manufacturers. (*Ibid.*) The trial court found the evidence was too imprecise and speculative to support finding jurisdiction. (*Id.* at p. 112.)

On appeal, the plaintiffs argued that they were not required to demonstrate the jurisdictional facts by a preponderance of evidence because the facts necessary to establish jurisdiction were " 'inseparably intertwined' " with the facts necessary to establish liability. (*In re Automobile Antitrust Cases I & II, supra*, 135 Cal.App.4th at p. 112.) They argued that establishing jurisdictional facts by a preponderance of evidence would effectively require them to prove the merits of their conspiracy case. (*Ibid.*)

The appellate court concluded the trial court was not required to draw an inference from the evidence that would compel a finding of liability, and therefore, jurisdiction. (*Ibid.*) Requiring the trial court to draw an inference from the evidence in favor of jurisdiction would relieve the plaintiffs' burden of proof as to the jurisdictional facts. (*Id.* at p. 113.) Also, the inference sought in that case violated the principle that jurisdictional facts must be established as to each individual defendant. (*Ibid.*) In

25

addition, a mandatory inference would interfere with the trial court's role as a fact finder on jurisdictional issues.  (*Ibid.*)

The appellate court noted, "These guidelines are not clear cut and are not susceptible to mechanical application.  Instead, courts take a highly realistic approach, weighing the facts in each case to determine whether the defendant's contacts with California are sufficient to support an exercise of jurisdiction consistent with federal due process."  (*In re Automobile Antitrust Cases I & II*, *supra*, 135 Cal.App.4th at p. 109.)

In the present case, there is no evidence that Boettiger engaged in any extreme and outrageous conduct directed at California.[1]  Boettiger's conduct directed at California consisted

---

[1] "The elements of the tort of intentional infliction of emotional distress are:  ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' "  (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903.)  To be considered outrageous, the conduct must be " 'so extreme as to exceed all bounds of that usually tolerated in a civilized community.' "  (*Ibid.*)  "Liability for intentional infliction of emotional distress ' "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." ' "  (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1051.)  Actions necessary to carry out the duties of business and personnel management include "hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or nonassignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like."  (*Janken v. GM Hughes Electronics* (1996)

26

of general personnel management activity.  Theno failed to show that his claim intentional infliction of emotional distress arose out of or were related to Boettiger's contacts with California.  "It is correct that a motion to quash for lack of personal jurisdiction does not implicate the merits of the complaint, but the plaintiff, in opposing the defendant's motion to quash, must present evidence to justify a finding that the requisite jurisdictional minimum contacts exist[.]" (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 540; but see *Bader v. Avon Products, Inc.,* (2020) 55 Cal.App.5th 186, 198 [plaintiff opposing motion to quash service need not prove product defect where evidence of sale of allegedly defective product in forum created basis for jurisdiction].)  The trial court properly quashed service of the complaint as to Boettiger.

## Specific Jurisdiction Over Fernandez

Theno similarly contends Fernandez is subject to specific jurisdiction in California because he purposefully directed defamatory and retaliatory conduct at California, knowing Theno would experience the effects in California.  We conclude that

---

46 Cal.App.4th 55, 64–65.)  "Managing personnel is not outrageous conduct beyond the bounds of human decency, but rather conduct essential to the welfare and prosperity of society.  A simple pleading of personnel management activity is insufficient to support a claim of intentional infliction of emotional distress, even if improper motivation is alleged." (*Id.* at p. 80.)

27

Theno did not meet his burden to establish the jurisdictional facts by a preponderance of the evidence as to Fernandez.

### 1. Evidence of Fernandez's Conduct

In Theno's briefs on appeal, he contends the following evidence submitted in opposition to Fernandez's motion to quash established the necessary jurisdictional facts as to Fernandez. Theno declared that after he complained about the trial initiative, Fernandez became hostile toward Theno on the weekly telephone calls with the area vice presidents. Theno was in California during the calls, while the other area vice presidents were presumably outside of California. Fernandez falsely criticized Theno's performance or ignored him during the calls. Fernandez praised other area vice presidents and not Theno, even though Theno's sales numbers and other metrics were consistently higher than the employees receiving praise.

Fernandez placed Theno on a performance improvement plan that stated he was not meeting performance expectations, inadequately assessed employees for hiring and promotion decisions, and was a poor planner. Although the plan was communicated to Theno in another state, Fernandez's subsequent communication about the plan was made to Theno in California.

For the first few months on the PIP, Theno attempted to comply with the plan by including Fernandez in calls with Theno's sales team, but Fernandez was never able to join the calls. Although Fernandez was not complying with the plan, he yelled at Theno about perceived mistakes, contradicted himself about hiring decisions, and unjustly accused Theno of being a poor leader without evidence to support his statements.

In August 2019, every area vice president was below their sales quotas, but Theno was the closest to reaching his sales target for the month. In a weekly phone call with the area vice presidents, Fernandez singled out Theno and berated him regarding the trial initiative. Theno found the comments demeaning in light of his performance. Some of Theno's peers on the telephone call were surprised and concerned by Fernandez's remarks to Theno about the trial initiative and discussed the comments with Theno after the call. Fernandez also stated, "nobody survives a PIP from me." Theno was the only area vice president on a performance improvement plan. Theno was humiliated and embarrassed by Fernandez's comment, and afraid he would be terminated because of his complaints about medical privacy violations.

In September 2019, Fernandez began participating in Theno's weekly calls with his sales team, as well as initiating calls to Theno's team inside and outside California without Theno. Theno and many of his sales team members were in California. During the calls with Theno's sales team, Fernandez constantly undermined Theno, talked over him, and berated him, making him feel irrelevant and incompetent in front of his own team.

Boettiger and Fernandez sent the area vice presidents a list of salespersons to recruit from a competitor, which Theno believed was an illegal use of the competitor's trade secrets. Theno refused to participate.

On October 4, 2020, Fernandez told Theno that he had not seen any progress from Theno, although Theno was consistently the top performer and had been sending weekly updates about his progress on the plan. Theno was in California during this

29

conversation. Fernandez continued to hold Theno responsible for things that resulted from Fernandez's actions or were out of Theno's control. That day, Theno sent a formal complaint to employee relations and to human resources stating that he was being retaliated against for complaining about medical privacy violations and the use of competitor sales information.

On October 11, 2020, Fernandez called Theno in California and terminated his employment.

## 2. Purposeful Availment and Relatedness

Theno's evidence of intentional tortious conduct by Fernandez directed at California was that Fernandez participated in weekly telephone calls with a group of area vice presidents that included an employee in California (Theno). After Theno complained about the trial initiative, Fernandez became hostile toward him during these weekly calls and criticized Theno's performance or ignored him.

Fernandez caused Theno to be placed on a PIP. In conversations between them, Fernandez yelled at Theno about perceived mistakes, contradicted himself about hiring decisions, and told Theno that he was a poor leader. Theno was in California during these conversations.

On a weekly call with the area vice presidents, Fernandez berated Theno about the trial initiative. He also stated, "nobody survives a PIP from me," knowing Theno was the only person on the call with a performance improvement plan.

Fernandez eventually participated in weekly calls with Theno's sales team as well, many of whom were in California. In these calls, Fernandez undermined Theno, talked over him, and

30

berated him. One time, Fernandez met with a doctor in Theno's territory in California without Theno present.

After Theno complained to employee relations about medical privacy violations and use of a competitor's trade secrets, Fernandez called Theno in California and terminated his employment.

There is no evidence Fernandez made any statement that was allegedly defamatory. In Theno's complaint, he alleged that Fernandez said he was insubordinate, incompetent, and untrustworthy, but in opposition to the motion to quash, he did not submit evidence that Fernandez made any of these statements. On appeal, Theno cites the allegations of his unverified complaint, which are not evidence, and refers to the statement in his declaration that Fernandez unfairly criticized Theno's performance during telephone calls with the area vice presidents. To the extent it can be inferred from Theno's declaration that Fernandez's criticism was a statement that Theno was incompetent, Theno was the only area vice president located in California during the calls. The allegedly defamatory statements were made to individuals outside of California during these calls and cannot support specific jurisdiction over Fernandez.

With respect to Theno's claim for intentional infliction of emotional distress, he provided evidence of personnel management activities directed at California but did not provide evidence that Fernandez engaged in any extreme and outrageous conduct directed at California with the knowledge that it would cause harm in California. Unlike the cases finding a defendant purposefully availed himself of forum benefits, Fernandez's conduct was directed to an individual employee who he

31

supervised and not a general California audience, and there was no argument that Fernandez's conduct implicated a forum interest expressed in a state statute. Theno failed to show that his claims for intentional infliction of emotional distress arose out of or were related to the evidence of Fernandez's conduct that he submitted. The trial court properly granted the motion to quash the complaint as to Fernandez as well.

## DISPOSITION

The orders are affirmed.  Respondents Frank Fernandez and Keith Boettiger are awarded their costs on appeal.
NOT TO BE PUBLISHED.


MOOR, J.


I concur:




KIM, J.

33

Kip Theno v. Frank Fernandez et al.
B314277


BAKER, Acting P. J., Concurring



The majority correctly holds there is no personal jurisdiction over defendant Frank Fernandez and I join the majority's analysis of that issue.  As to defendant Keith Boettiger, I agree the majority reaches the correct result.  The claimed tortious conduct by Boettiger, principally occurring on telephone calls with area vice-presidents for other regions of the United States, was not "'California-directed' in any meaningful sense."  (*Halyard Health, Inc. v. Kimberly-Clark Corp.* (2019) 43 Cal.App.5th 1062, 1076.)



BAKER, Acting P. J.